**FTC Letter 1**

Exhibit C

UNITED STATES OF AMERICA
**FEDERAL TRADE COMMISSION**
WASHINGTON, D.C. 20580

Division of Credit Practices
Bureau of Consumer Protection

Clarke W. Brinckerhoff
Attorney

(202) 326-3224

March 3, 1998

Paul H. Schieber, Esq.
Blank Rome Comisky & McCauley
One Logan Square
Philadelphia, PA 19103

Dear Mr. Schieber:

This responds to your letters dated November 28, 1997, and January 22, 1998, on behalf of the Mortgage Insurance Companies of America ("MICA"), stating your opinion that Section 615(a) of the Fair Credit Reporting Act ("FCRA") does not require a mortgage insurer to provide notice to an applicant for a residential mortgage when it refuses to insure the loan for which the consumer has applied.

You describe a common scenario in the mortgage lending industry in which a lender submits a residential loan application file to a mortgage insurer ("MI") to obtain insurance that protects the lender against the consumer's default on that loan. A credit report from a major credit bureau, which the MI may receive as part of the file or obtain on its own, is often a part of the MI's decisionmaking process. It is not uncommon for the first MI contacted by the lender to decline coverage, but for another MI subsequently to insure the transaction, with the result that the consumer obtains the loan.

Section 615(a) provides that a person that "takes adverse action with respect to any consumer that is based in whole or part on any information contained in a consumer report" must notify the consumer of the action, and provide information relating to the consumer reporting agency that provided the report and the consumer's rights under the FCRA. You support your belief that an MI should not be required to provide this notice with (1) a legal argument that the section does not apply where an MI declines to insure a consumer residential loan based on the credit report on the applicant, and (2) a policy argument that consumers will be confused or distressed by the notices. We disagree, for the reasons set forth in this letter.

In our view, the plain language of Section 615(a) requires MIs to provide the notice. First, an MI takes "adverse action" -- in both the common sense and legal definition of that term -- when it declines to extend insurance coverage that is a prerequisite for approval of the consumer's residential mortgage loan application. That term is defined broadly by Section 603(k)(1)(B)(i) to include "a denial ... in connection with the underwriting of insurance . . .." An MI's refusal to insure a consumer loan is certainly a "denial in connection with the underwriting of insurance."

Similarly, the term "consumer report" is defined broadly in Section 603(d) of the FCRA and certainly includes the garden-variety credit report from a major credit bureau used by lenders and their MIs. A credit report contains information "bearing on a consumer's credit

worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living" that the bureau "collected ... for the purpose of serving as a factor in establishing the consumer's eligibility for" credit, insurance, employment, or other purposes for which the agency is permitted to provide reports under the FCRA, and is therefore undeniably included within the definition set forth in Section 603(d).[1] The report's status as a "consumer report" in this case is reinforced by the fact that the critical insurance factors relate to the consumer, not the lender with which the MI does business. First, the reason the MI is allowed to obtain a report on the loan applicant is because Section 604(a)(3)(C) provides a permissible purpose "in connection with the underwriting of insurance on the *consumer*" (emphasis added).[2] Second, the party evaluated by the MI is the *consumer*. Third, the premium when coverage is granted is paid by the *consumer*.

Finally, we are unpersuaded by your policy argument that consumers will be confused by receiving the notices required by Section 615(a) from one or more MIs, even in the case where the loan application itself is ultimately approved when a second MI agrees to provide coverage. We believe that the benefit provided by the notice -- fulfilling Section 615's critical function of informing the consumer that something in a credit bureau file caused the MI's action -- outweighs any problems that might arise when consumers get the notice. If MIs, perhaps with the assistance of lenders with which they do business (as suggested in your January 22 letter, and discussed in the following paragraph), craft the text of their notices to explain to the applicant the circumstances under which the MI has taken its action and the process involved, potential confusion can be minimized. A notice that includes the specific items set forth in Section 615(a) will comply with that provision, even with such an explanation included in the text.

An MI may meet its responsibility under Section 615(a) by contracting with a lender (or other party) to deliver the notice to the consumer.[3] In that case, the lender may fulfill the MI's obligation by providing to the consumer either (1) a separate notice in the name of the MI, or (2) its own notice that communicates the refusal by one or more MIs to insure the loan (including, if applicable, information that the lender is required by Regulation B to disclose to the consumer if it has denied the loan application). In that way, MIs and their lender clients can arrange to comply with the FCRA without providing duplicative notices to the consumer.

The opinions set forth in this informal staff letter are not binding on the Commission.

Sincerely yours,

Clarke W. Brinckerhoff

---

1. Your letter's lengthy argument that the lender and MI are engaged in a "commercial transaction" -- and that the insurance is issued for a "commercial purpose" as a technical matter -- is simply not germane to the status of a report from a credit bureau as a "consumer report." That might have relevance if the report concerned the applicant's business history and was provided by an agency that compiles and provides data for commercial purposes; in that case, personal references to a corporate director or officer would not change the commercial credit report into a consumer report. Comment 603(d)-4C, Federal Trade Commission Commentary on the FCRA, 55 Fed. Reg. 18804, 18810 (May 4, 1990).

2. A commercial purpose, standing alone, would be insufficient under Section 604 to provide the MI a permissible purpose to obtain a credit report on the consumer applicant.

3. Of course, the MI would have some exposure if the lender with which it contracted failed to deliver the

Exhibit C

required notice. However, Section 615(c) specifically would allow the MI to avoid liability if it "shows, by a preponderance of the evidence that at the time of the alleged violation [the MI] maintained reasonable procedures to assure compliance with the provisions of this section." We believe that this provision would protect an MI, if it contracted with one or more responsible lenders to deliver notices required by Section 615(a) and appropriately monitored such other parties' performance of that obligation.

**FTC Letter 2**

Exhibit C

UNITED STATES OF AMERICA
**FEDERAL TRADE COMMISSION**
WASHINGTON, D.C. 20580

Division of Financial Practices

Clarke W. Brinckerhoff
Attorney

202-326-3224

October 26, 1998

William F. Hall, Esquire
Law Department
United Guaranty Residential Insurance Co.
230 North Elm Street
Greensboro, North Carolina 27401

**Re:** Section 615(a) of the Fair Credit Reporting Act

Dear Mr. Hall:

This responds to your letter on behalf of United Guaranty Residential Insurance Company of North Carolina and United Guaranty Credit Insurance Company (collectively "UGICO"). You report that UGICO obtains consumer report information from lenders who apply for insurance to protect them in the event borrowers default on unsecured property improvement loans and second mortgage residential loans. You inquire whether UGICO is required by Section 615(a) of the Fair Credit Reporting Act ("FCRA") to provide notice to the individual debtor when it refuses to provide credit insurance because of such consumer report information.

You correctly cited our letter to an attorney for Mortgage Insurance Companies of America (*Schieber*, 3/3/98), which states that mortgage insurers must provide the notices required by Section 615(a) of the FCRA.[1] You contend that the result should be different here, primarily because the motivation of a lender that purchases UGICO's credit insurance is different from the motivation of a lender that procures mortgage insurance offered by Mr. Schieber's clients.[2] Specifically, you assert that UGICO's clients use credit insurance as a way to manage the risk on their loan portfolio, unlike the lenders who obtain mortgage insurance as a critical step in making a mortgage loan to meet the requirements of a secondary market. In our view, that factor has no bearing on the duty imposed by Section 615(a) on an insurer that "takes any adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report" to notify the consumer of the action, and provide information relating to the credit bureau that provided the report and the consumer's rights under the FCRA. "Adverse action" is defined very broadly in Section 603(k)(1)(B)(I) to include "a denial ... in connection with the underwriting of insurance." It is therefore our opinion that UGICO's refusal to insure a consumer loan is a "denial in connection with the underwriting of insurance" that requires it to comply with Section 615(a), just like the mortgage insurers discussed in our letter.[3]

In closing, your letter asserts that there exists a "practical problem of how to give a meaningful notice that complies with Section 615(a)." You state that UGICO may not know the source of information, if it is not specified in the file it reviews, and thus it may not be able to provide a meaningful notice to the consumer. It is our experience, based on our extensive contacts with representatives of mortgage insurers in preparing our response to

Exhibit C

Mr. Schieber, that lenders and insurers can work together to properly identify information and craft notices that will comply with Section 615(a) and be helpful to consumers.[4] Similarly, the first paragraph of your letter acknowledges that UGICO's own mortgage insurer affiliate now complies with the requirements of Section 615(a). We see nothing in your presentation that causes us to doubt UGICO's capacity to do the same.

The opinions set forth in this informal staff letter are not binding on the Commission.

Sincerely yours,

Clarke W. Brinckerhoff

---

1. Enclosed are copies of the correspondence to which we were responding, which is cited in footnotes below. (Schieber-Brinckerhoff letters dated 11/28/97 and 1/22/98).

2. You also note that UGICO always obtains the credit report information indirectly from the lender as part of the application process, never directly from a credit bureau. That is clearly not a distinguishing factor, because similarly some "mortgage insurance companies . . . rely on reports, or information extracted from reports, forwarded to them by the lender." (Schieber-Brinckerhoff letter dated 11/28/97, page 2).

3. The legal analysis is the same because the factual background is the same. Like UGICO, a "mortgage insurer decides whether to guarantee a lender's risk regarding a particular obligation owed to the lender." (Schieber-Brinckerhoff letter dated 11/28/97, page 3).

4. See the mortgage industry's proposal (Schieber-Brinckerhoff letter dated 1/22/98) and our response on page 3 of the March 3 letter that you cited.

**FTC Letter 3**

Exhibit C



UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

Division of Financial Practices

Hannah Stires
Attorney

March 1, 2000

Mr. James M. Ball
Vorys, Sater, Seymour and Pease LLP
50 East Gay Street
P.O. Box 1008
Columbus, OH 43216-1008

    **Re**: Fair Credit Reporting Act - Request for Interpretation

Dear Mr. Ball:

This will respond to your letter concerning the use of consumer reports in the underwriting of insurance. In your letter, you state that your client, an insurance company (the "Company"), is introducing a new program (the "Good Credit Discount Program") under which consumers who satisfy certain credit scoring criteria will be entitled to purchase property and casualty insurance policies ("P&C Policies") at a discounted premium rate. Historically, the Company has not taken into consideration any information relevant to the consumer's credit history or status. You have several questions that arise under the Fair Credit Reporting Act ("FCRA") with respect to the implementation and operation of the Good Credit Discount Program.

*1. Is the Company legally entitled - pursuant to § 604(a)(3)(C) of the FCRA, 15 U.S.C. § 1681b(a)(3)(C) - to obtain consumer reports on existing P&C Policyholders for the purpose of determining whether such existing P&C Policyholders will be entitled to a discount under the Good Credit Discount Program upon renewal of existing P&C Policies?*

Section 604(a)(3)(C) of the FCRA states that any consumer reporting agency may furnish a consumer report under the following circumstances:

> To a person which it has reason to believe . . . intends to use the information in connection with the underwriting of insurance involving the consumer.

Further, Comment 604(3)(C)-1 of the Federal Trade Commission Commentary on the FCRA states:

> An insurer may obtain a consumer report to decide whether or not to issue a policy to the consumer, the amount and terms of coverage, the duration of the policy, the rates or fees charged, or whether or not to renew or cancel a policy, because these are all "underwriting" decisions.

55 Fed. Reg. 18804, 18816 (1990).

According to your letter, the Company will be using the credit reports to make a decision concerning the rates or fees charged in the renewal of policies, and thus will be using the

credit reports for an "underwriting" decision, which is a permissible purpose of a consumer report under § 604(a)(3)(C) of the FCRA.

*2. Do the actions taken in three hypothetical scenarios (verbatim from your letter) constitute "adverse actions" for purposes of § 615(a) of the FCRA, 15 U.S.C. § 1681m(a)?*

> **Scenario #1.** *In anticipation of the commencement of the Good Credit Discount Program, the Company determines, based in whole or in part on information contained in a consumer report, that for purposes of policy renewal, an existing P&C Policyholder - who could not have previously qualified for a good credit discount since none was previously offered by the Company - will not qualify for the credit discount available under the Good Credit Discount Program, but will continue to qualify for P&C Policy coverage at a non-discounted rate.*
>
> **Scenario #2.** *In connection with, or subsequent to, the initiation of the Good Credit Discount Program, the Company or one of its independent agents (a) provides to a potential customer who is applying for a P&C Policy a preliminary premium rate quote that does not reflect the discount potentially available under the Good Credit Discount Program, and (b) thereafter, the Company or the independent agent determines, based in whole or in part on information contained in a consumer report, that such customer will qualify for coverage at the previously quoted rate, but will not qualify for the credit discount available under the Good Credit Discount Program.*
>
> **Scenario #3.** *In connection with, or subsequent to, the initiation of the Good Credit Discount Program, the Company or one of its independent agents (a) provides to a potential customer who is applying for a P&C Policy a preliminary premium rate quote at the discounted rate available under the Good Credit Discount Program, and (b) thereafter the Company or its independent agent determines, based in whole or in part on information contained in a consumer report, that such customer will not qualify for the previously quoted discounted rate.*

The term "adverse action" is defined in § 603(k) of the FCRA, 15 U.S.C. § 1681a(k), a provision that was added to the FCRA as part of the Consumer Credit Reporting Reform Act of 1996.[1] With regard to the underwriting of insurance, "adverse action" means:

> a denial or cancellation of, an increase in any charge for, or a reduction or other adverse or unfavorable change in the terms of coverage or amount of, any insurance, existing or applied for, in connection with the underwriting of insurance.

Section 603(k)(1)(B)(i) of the FCRA, 15 U.S.C. § 1681a(k)(1)(B)(i)

The legislative history of this section indicates that Section 603(k) is to be read broadly:

> This list is illustrative, and not definitive. It is the Committee's intent that, whenever a consumer report is obtained for a permissible purpose under section 604(a), *any action taken based on that report that is adverse to the interests of the consumer triggers the adverse action notice requirements under section 615.*

H.R. Rep. No. 103-486 at 26 (1994). *See also* H.R. Rep. No. 102-692 at 21 (1992), and S. Rep. No. 103-209, at 8 (1993)(emphasis added).

In all three cases, it is our view that Section 615(a) requires the adverse action notice because the consumer has suffered "adverse" action, as defined in Section 603(k)(1)(B)(i), due to an "increase in (the premium) charge for . . . insurance." In all cases, the premium is increased from what otherwise would have been charged to the consumer because of the consumer report.

In your Scenario #3, the discounted rate is quoted to a consumer applicant for insurance, but the individual is charged the higher rate because of the consumer report. The insurer's

determination clearly constitutes an adverse action by the Company because it is literally an increase in the premium quoted for the insurance.

In your Scenarios ##1-2, the discounted rate is not actually quoted to the existing insured consumer (#1) or new applicant (#2). Nevertheless, it is our view that in both cases there is an "increase" in the charge for existing insurance, one of the categories of "adverse action" enumerated in § 603(k) of the FCRA, with the result that Section 615(a) requires the insurer to provide an adverse action notice to the consumer. In #1, the charge for the insurance is "increased" when the policyholder applies to renew the policy, and the application is approved with only a higher premium because the policyholder's credit history does not qualify for the good credit discount at a lower rate. In #2, the applicant will have to pay more for insurance at the inception of the policy than he or she would have been charged if the consumer report had been more favorable. The Company has "increased" the premium rate to the individual in both cases because of the consumer report. The customer is charged more than would have been the case if his or her credit report had been more favorable, which we believe constitutes an "increase" under the statutory language.

In sum, the legislative history indicates that the term "adverse action" should be read broadly to include any action taken whenever a credit report is obtained for a permissible purpose that is "adverse to the interests of the consumer." In all your scenarios, the Company has obtained a consumer report for a permissible purpose, i.e., to make a decision about the underwriting of insurance, and then taken "adverse action" as defined in Section 603(k)(1)(B)(i) by charging the consumer a higher insurance premium (subjecting the consumer to an "increase" in such charges) than it would have offered if the report had been more favorable. In the language of the legislative history quoted above, the insurer has taken "action that is adverse to the interest of the consumer" whether the consumer is quoted and then denied the lower rate, or a current policyholder or new applicant is considered for the lower premium and does not receive it. The insurer's determination places the consumer at a financial disadvantage, an act clearly adverse to his or her interests. Thus, we believe the insurer must provide the Section 615(a) notice in all of these situations.

Our view that Section 615(a) requires the insurer to provide an adverse action notice in these situations is consistent with the policy behind the provision. The purpose of Section 615(a) in this context is to put the insurance applicant or policyholder on notice that something in his or her credit file has caused an insurer to treat the consumer unfavorably. With that information in hand, the individual is able to contact the credit bureau, which is required to disclose the information in the file (Section 609), and to reinvestigate any item disputed in good faith and make any deletions or corrections that are needed based on that reinvestigation (Section 611). The insurance applicant or policyholder in each of the three situations you have related is precisely the type of consumer that Section 615(a) is designed to assist. If there is inaccurate information in a consumer report that causes the insurer to charge the consumer a higher premium, the consumer can seek reconsideration and qualify for the lower rate after his or her credit history is corrected. The individual who gets the discounted rate doesn't need the information because his or her credit file is having no negative impact, but the other consumers need to be put on notice that they can learn the information in the file, and force the credit bureau to correct or delete it if it is inaccurate.

This is an informal staff opinion and is not binding on the Commission.

Sincerely,

Hannah A. Stires

Exhibit C

1. Omnibus Consolidated Appropriations Act for Fiscal Year 1997, Title II, Subtitle D, Chapter 1; Pub. L. No. 104-208, 110 Stat. 3009

Exhibit C