# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

No. 03-35695

---

## MATTHEW RAUSCH and JASON REYNOLDS,
### Plaintiffs-Appellants,

v.

## THE HARTFORD FINANCIAL SERVICES GROUP, INC., and
## HARTFORD FIRE INSURANCE COMPANY,
### Defendants-Appellees.

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

---

## BRIEF OF THE FEDERAL TRADE COMMISSION AS *AMICUS CURIAE*
## SUPPORTING APPELLANTS AND URGING REVERSAL

---

**WILLIAM E. KOVACIC**
**General Counsel**

**JOHN F. DALY**
**Deputy General Counsel for Litigation**

**LAWRENCE DeMILLE-WAGMAN**
**Attorney**
**Federal Trade Commission**
**600 Pennsylvania Ave., N.W.**
**Washington, D.C. 20580**
**(202) 326-2448**

Exhibit D

# TABLE OF CONTENTS

Page

INTEREST OF THE FEDERAL TRADE COMMISSION . . . . . . . . . . . . . . 1

ISSUE PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      1. The Fair Credit Reporting Act . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      2. Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      3. Proceedings Below . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

AN INSURANCE COMPANY THAT, BASED ON
  INFORMATION IN A CONSUMER REPORT, CHARGES
  A CONSUMER A HIGHER PRICE THAN IT WOULD HAVE
  CHARGED HAD THE INFORMATION BEEN MORE
  FAVORABLE, HAS TAKEN "ADVERSE ACTION"
  WITH RESPECT TO THAT CONSUMER . . . . . . . . . . . . . . . . . . . . . . 10

      A.    The district court misinterpreted § 1681a(k)(1)(B)(i) . . . . . . 10

      B.    The district court improperly ignored the FCRA's
           legislative history . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

Exhibit D

## TABLE OF AUTHORITIES

FEDERAL CASES                                                          **Page**

*Cornist v. B.J.T. Automobile Sales, Inc.*, 272 F.3d 322 (6th Cir. 2001) . . . 12

*Exxon Mobil Corp. v. EPA*, 217 F.3d 1246 (9th Cir. 2000) . . . . . . . . . 16, 19

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) . . . . . 15

*FTC v. Associates First Capital Corp.*,
   No. 1:01-CV-00606 (N.D. Ga. May 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Mark v. Valley Insurance Co.*, 275 F. Supp. 2d 1307 (D. Or. 2003) . *passim*

*Ollestad v. Kelley*, 573 F.2d 1109 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . 2

*Ramirez-Zavala v. Ashcroft*, 336 F.3d 872 (9th Cir. 2003) . . . . . . . . . . . . 15

*Rucker v. Davis*, 237 F.3d 1113 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . 14

*Scharpf v. AIG Marketing, Inc.*,
   242 F. Supp. 2d 455 (W.D. Ky. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 3, 10

*United States v. Equifax Credit Information Services, Inc.*,
   No. 1:00-CV-00087 (N.D. Ga. Jan. 26, 2000) . . . . . . . . . . . . . . . . . . . . . . 1

*United States v. Performance Capital Management*,
   No. 01-01047-TJH (C.D. Cal. Feb. 6, 2001) . . . . . . . . . . . . . . . . . . . . . . . 1

### FEDERAL STATUTES

Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* . . . . . . . . . . . . . . . . . 1

   § 1681(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   § 1681(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Exhibit D

§ 1681a(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 22

§ 1681a(k)(1)(B)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

§ 1681a(k)(1)(B)(iv) . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 14, 15

§ 1681b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 19, 21, 23

§ 1681g(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

§ 1681i(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

§ 1681j(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

§ 1681m . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

§ 1681m(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 17

§ 1681n . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

§ 1681o . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

§ 1681s . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

§ 1681s-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Consumer Credit Reporting Act of 1996, P.L. 104-208 . . . . . . . . . . . . . . 19

Fair and Accurate Credit Transactions Act of 2003 P.L. 108-159 . . . . . 1, 26

15 U.S.C. § 1691(d)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**MISCELLANEOUS**

12 C.F.R. § 202.2(c)(1)27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

16 C.F.R. Part 600 (55 Fed. Reg. 18804 (May 4, 1990)) . . . . . 1, 18, 19, 20

-iii-

Exhibit D

16 C.F.R. Part 601 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 26

62 Fed. Reg. 35586 (July 1, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

H.R. 1015, 103d Cong. (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

H.R. 3596, 102d Cong (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

H.R. Conf. Rep. 91-1587 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

H.R. Rep. 102-692 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

H.R. Rep. 103-486 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

S.650, 104th Cong. (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

S.823, 91st Cong. (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

S. 783, 103d Cong. (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 25

S. Rep. No. 91-517 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 18, 24

S. Rep. 103-209 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 25

S. Rep. 104-185 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

Fed. R. Civ. P. 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Exhibit D

## INTEREST OF THE FEDERAL TRADE COMMISSION

The Fair Credit Reporting Act ("FCRA" or "the Act"), 15 U.S.C. § 1681 *et seq.*, seeks to ensure the "[a]ccuracy and fairness of credit reporting," § 1681(a), which Congress recognized as important not only to the interests of individual consumers but also to the efficient functioning of the banking system. Congress has entrusted the Federal Trade Commission ("FTC" or "the Commission") with primary responsibility for governmental enforcement of the FCRA while also affording consumers the right to bring private actions under the Act. §§ 1681n, 1681o, 1681s. The Commission regularly brings enforcement actions pursuant to this authority.[1] It has issued interpretive guidance regarding various aspects of the Act's requirements, 16 C.F.R. Part 600, and as directed by the Act, promulgated a Summary of Consumer Rights, Notice of User Responsibilities, and Notice of Furnisher Responsibilities, 16 C.F.R. Part 601. In addition, Congress recently passed the Fair and Accurate Credit Transactions Act of 2003 ("FACTA"), P.L. 108-159, 117 Stat. 1952. This law adds

---

[1] *See, e.g., FTC v. Associates First Capital Corp.*, No. 1:01-CV-00606 JTC (N.D. Ga. May 2003) (lender obtained consumer reports for impermissible purpose); *United States v. Equifax Credit Information Servs., Inc.*, No. 1:00-CV-00087 (N.D. Ga. Jan. 26, 2000) (failure to provide adequate consumer access for inquiries regarding consumer report errors); *United States v. Performance Capital Management*, No. 01-01047-TJH (C.D. Cal. Feb. 6, 2001) (debt collection company violated FCRA by furnishing consumer reporting agencies with inaccurate delinquency dates).

-1-

Exhibit D

numerous provisions to the FCRA and gives the Commission significant rulemaking responsibility in connection with the implementation of those amendments. In light of the Commission's key role administering the FCRA, this Court has found it appropriate to defer to the Commission's analysis of the Act's provisions. *See Ollestad v. Kelley*, 573 F.2d 1109, 1111 (9th Cir. 1978).

To further the FCRA's goals of fairness and accuracy, Congress imposed distinct obligations on the various entities involved in the compilation and use of consumer reports: the consumer reporting agencies that assemble and disseminate the reports[2] (§ 1681(b)); "furnishers," who provide the data to be compiled (§ 1681s-2); and those who use consumer reports to make decisions regarding credit, employment, insurance, or other matters (§ 1681m). The requirements imposed on "users" -- *i.e.*, that they notify consumers of "adverse actions" taken on the basis of information obtained in a consumer report -- serve a pivotal function in assuring the fairness and accuracy of the consumer reporting system. Such notices are often the only way in which consumers learn of inaccurate or incomplete information in their reports -- and thus provide them an opportunity to take steps to correct any such information.

---

[2] Consumer reporting agencies are commonly known as "credit bureaus," and consumer reports are commonly known as "credit reports," although, as demonstrated by this case, the reports are used not only by creditors, but by employers, insurers, and others. *See* § 1681b (setting forth those persons who have a "permissible purpose" for receiving a consumer report from a consumer reporting agency).

-2-

In the present case, a district court has improperly dismissed a private lawsuit based on its conclusion that an insurance company does not violate the FCRA when it fails to inform the consumer that, based on information in a consumer report, the insurance company has set the price of that consumer's insurance higher than the price it would have offered if the information in the report had been more favorable. This holding flies in the face of the Act and its legislative history. It is also at odds with the Commission's Notice of User Responsibilities, which states that the term "adverse action" is defined "very broadly" by the FCRA to include all business actions "that can be considered to have a negative impact" on the consumer. 16 C.F.R. Part 601, App. C. It will, if upheld, seriously weaken the enforcement of the Act and significantly undermine its protections in connection with the underwriting of insurance. Because the district court's decision conflicts with the decision of another district court (*Scharpf v. AIG Marketing, Inc.*, 242 F. Supp. 2d 455 (W.D. Ky. 2003)), and because this Court's ruling will likely be the first appellate precedent, the outcome of this case is of great importance to the Commission.

## ISSUE PRESENTED FOR REVIEW

Whether an insurance company takes "adverse action" against a consumer, as that term is defined in the FCRA, when, based on information in a consumer report, the insurance company sets a price for insurance that is higher than the price it would

-3-

have offered to the consumer if the information in the report had been more favorable.

## STATEMENT OF THE CASE

### 1. The Fair Credit Reporting Act

Congress passed the FCRA in 1970 after extensive hearings. Those hearings showed the importance of credit reporting to the economy but revealed certain crucial abuses. Primary among these was that the consumer reporting industry was cloaked in a shroud of secrecy:

> One problem which the hearings * * * identified is the inability at times of the consumer to know he is being damaged by an adverse credit report. Standard agreements between credit reporting agencies and the users of their reports prohibit the user from disclosing the contents of the report to the consumer. In some cases, the user is even precluded from mentioning the name of the credit reporting agency. Unless a person knows he is being rejected for credit or insurance or employment because of a credit report, he has no opportunity to be confronted with the charges against him and tell his side of the story.

S. Rep. No. 91-517 at 3 (1969).

The FCRA addresses this problem by requiring that, when any "person" (which includes an insurance company, *see* § 1681a(b)) takes any "adverse action" with respect to a consumer based even in part on information in a consumer report, that person must notify the consumer that adverse action was taken, and must furnish the consumer with the name and address of the consumer reporting agency that was the source of the report. § 1681m. The person must also inform the consumer that the

-4-

Exhibit D

FCRA allows the consumer to dispute the accuracy or completeness of information in the consumer report. *Id.* The Act further requires a consumer reporting agency, upon request, to provide a consumer with a copy of the report, § 1681g(a), and to provide that report free of charge, if the consumer makes the request within 60 days of receiving a notice of adverse action, § 1681j(b). The Act also requires the agency to reinvestigate information in the report that the consumer disputes, § 1681i(a), and to delete information that is inaccurate or cannot be verified, § 1681i(a)(5). Thus, these provisions of the FCRA dovetail to make the credit reporting system more open and reliable -- the consumer must be told when adverse action is based on a consumer report, and then the consumer may determine whether the report contains inaccurate information. Absent the notice, the consumer may never know to invoke the Act's accuracy protections, and, as in a case such as this one, may never even learn that adverse action has occurred.

### 2. Factual Background

This case was brought by two consumers who purchased insurance policies from defendant insurance companies ("Hartford").[3] The essential facts of the case are

---

[3] The plaintiffs sought class certification, pursuant to Fed. R. Civ. P. 23, but did not receive it. There is also disagreement between the parties as to the appropriate defendants in this case. The district court's dismissal order was based on a complaint that named two corporations, neither of which sold insurance to plaintiffs. *See* D.104 at 1-3; D.156 at 4. (Documents on the district court's docket

-5-

not in dispute. Plaintiff Reynolds applied for personal insurance (automobile insurance and tenant's insurance) from Hartford.[4] As part of its underwriting process, Hartford obtained a consumer report with respect to Reynolds, and used information from that report regarding his credit-worthiness (or, more precisely, used the fact that he had an inadequate number of credit accounts) to determine the premiums it would charge him for the insurance he requested. *See Mark v. Valley Insurance Co.*, 275 F. Supp. 2d 1307, 1309-11 (D. Or, 2003) (describing the process by which insurance companies use information regarding a consumer's credit history to predict the likelihood that the consumer will make claims under an insurance policy). Based on that consumer report, Hartford offered insurance to Reynolds at a price that was higher than the price it would have offered had the information in his report been more favorable. Reynolds purchased insurance from Hartford. Hartford did not

---

are referred to as "D.xx.") However, the court also denied, as futile, plaintiffs' motion to further amend their complaint to add as defendants affiliated companies that did sell them insurance. D.156 at 6-7. The court's reasoning in concluding that amendment would be futile relates to the merits issue discussed herein -- *i.e.*, its erroneous supposition that *no* insurer could have obligations to issue an adverse action notice unless it had a preexisting insurance contract with the consumer. *Id.* For the reasons set forth below, the Commission disagrees with that premise. We take no position, however, as to which of the various entities would be the proper defendant in this case.

[4] Matthew Rausch was also named as a plaintiff. However, plaintiffs have chosen not to pursue the appeal on his behalf.

provide Reynolds with a notice informing him that, based on his consumer report, it was charging him a higher price.

### 3. Proceedings Below

On July 8, 2002, plaintiffs filed their First Amended Complaint, D.72, alleging that, in connection with the underwriting of the insurance policies they purchased, Hartford took "adverse action," as that term is defined in the FCRA, but failed to provide them with an adequate adverse action notice, as required by the FCRA. On February 14, 2003, Hartford moved for summary judgment arguing, *inter alia*, that, because the plaintiffs' insurance policies had been issued by Property and Casualty Insurance Co. of Hartford, Hartford Insurance Co. of the Midwest, and Omni Insurance Co., the named defendants were not the proper parties; and that, in any event, no adverse action was taken with respect to the plaintiffs.[5] D.96, 97. Plaintiffs moved to amend their complaint to add as defendants the three companies that issued the insurance policies. D.106.

The court (per Judge Brown) granted Hartford's motion on July 31, 2003, and

---

[5] Hartford also argued that the notice it provided to plaintiff Reynolds complied with the adverse action notice requirement of § 1681m. It is the Commission's view that, because the notice did not inform Mr. Reynolds that Hartford was charging him a higher price, the notice was inadequate because it clearly failed to "provide * * * notice of the adverse action to the consumer." *See* § 1681m(a)(1).

-7-

dismissed plaintiffs' complaint. D.156, 157. It based its decision on its opinion in *Mark v. Valley Ins. Co., supra.* In that case, it held that, when an insurance company sets the initial price for an insurance policy it will offer a consumer, there is no "adverse action," as that term is defined in the FCRA, no matter what price the insurance company sets, because "an insurer cannot 'increase' a charge for insurance unless the insurer makes an initial demand for payment to the insured and subsequently increases the amount of the demand based on information in the insured's credit report." D.156 at 5. Further, an insurer "cannot 'reduce' or 'unfavorably or adversely change' the terms of insurance unless such terms previously existed and the insurer subsequently alters those terms in an unfavorable manner." *Id.* Accordingly, the court held that defendants were entitled to summary judgment because "the initial setting of [plaintiffs'] insurance premiums did not constitute 'adverse action' under FCRA." *Id.* Based on its interpretation of the term "adverse action," the court also concluded that there had been no violation of the FCRA by any of the three companies that issued the insurance policies. Thus, it denied as "futile" plaintiffs' motion to amend their complaint. D.156 at 6-7.

## SUMMARY OF ARGUMENT

When an insurance company uses information in a consumer report to set the initial price it will charge for insurance, and when, as a result of that information, it

-8-

charges the consumer a higher price, the insurance company has taken an "adverse action" with respect to that consumer, as that term is defined in § 1681a(k)(1)(B)(i) of the FCRA.  Pursuant to § 1681a(k)(1)(B)(i), adverse action encompasses "an increase" in the price charged for insurance.  The district court limited the term "increase" to an enlargement of a price previously charged the same consumer.  But a price that a consumer pays is also "increased" when the consumer is charged more than other consumers are charged at the same time.  The court's narrow interpretation of § 1681a(k)(1)(B)(i) is inconsistent with common parlance, and with § 1681a(k)(1)(B)(iv), which demonstrates that the definition of "adverse action" should be interpreted broadly.  (Part A, *infra*.)

A broad interpretation of § 1681a(k)(1)(B)(i) is also consistent with the Act's legislative history.  That history shows that, for the first 26 years of the Act, from 1970 to 1996, setting higher initial rates for insurance constituted adverse action triggering an adverse action notice.  There is no indication that, when Congress amended the Act in 1996 to add a definition of "adverse action," it intended to contract the Act's coverage.  To the contrary, that history shows that Congress wanted to increase the situations in which unfavorable action based in whole or in part on a consumer report would lead to an adverse action notice.  (Part B, *infra*.)

-9-

Exhibit D

# ARGUMENT

## AN INSURANCE COMPANY THAT, BASED ON INFORMATION IN A CONSUMER REPORT, CHARGES A CONSUMER A HIGHER PRICE THAN IT WOULD HAVE CHARGED HAD THE INFORMATION BEEN MORE FAVORABLE, HAS TAKEN "ADVERSE ACTION" WITH RESPECT TO THAT CONSUMER

When an insurance company sets a higher initial price for insurance based on information in a consumer report, it takes an "adverse action," as that term is defined in § 1681a(k)(1)(B)(i) of the Act. The district court misinterpreted this subpart. As a result, its opinion is at odds with both the central purpose of the FCRA, and the Act's legislative history.[6] This Court should reverse the district court's decision on this issue, a decision that, if upheld, would derail the FCRA's primary mechanism for promoting the accuracy and completeness of consumer reports.

### A.     The district court misinterpreted § 1681a(k)(1)(B)(i)

The district court misinterpreted § 1681a(k)(1)(B)(i). That section states:

(k) Adverse Action.

(1) Actions Included. The term "adverse action" -- * * *     **(B)**

means --

---

[6]   The district court's opinion also conflicts with dicta in *Scharpf v. AIG Marketing, Inc.*, 242 F. Supp. 2d 455, 467 (W.D. Ky. 2003), where the court held that the term "adverse action" "should be read broadly" and should apply to any action whenever a consumer report is obtained for a permissible purpose and the user takes an action that is adverse to the consumer's interests.

-10-

Exhibit D

> (i) a denial or cancellation of, an increase in any charge for,
> or a reduction or other adverse or unfavorable change in
> the terms of coverage or amount of, any insurance, existing
> or applied for, in connection with the underwriting of
> insurance * * *.

According to the court, Hartford did not take adverse action, as defined by § 1681a(k)(1)(B)(i), because, even though it charged Mr. Reynolds a higher price, it did not "increase" any charge. In the court's view, "an insurer cannot 'increase' a charge for insurance unless the insurer makes an initial demand for payment to the insured and subsequently increases the amount of that demand based on information in the insured's credit report." D.156 at 5. That is, even if a consumer requests an advertised price but the insurer refuses to offer insurance at that price as a result of information in a consumer report, the insurance company has not taken adverse action.[7] The court's only support for this conclusion was its own decision in *Mark v. Valley Insurance Co.* In that case, it observed that the dictionary definition of "increase" is "to make something greater or larger," and then it concluded that "[a]n insurer cannot 'make greater' something that did not exist previously." 275 F. Supp.

---

[7] Pursuant to the court's reasoning, although Hartford would have to provide a consumer with an adverse action notice if, based on a consumer report, it denied an application for insurance (because § 1681a(k)(1)(B)(i) specifically states that a denial of an application constitutes adverse action), Hartford would not have to provide a notice if it effectively achieved the same result by offering insurance to the consumer at a prohibitively high price.

-11-

2d at 1316. In the court's view, its interpretation of this section comported with "the plain meaning of the language Congress chose to employ." *Id.*

In fact, the meaning of this section is not nearly so "plain." Although the court focused on the fact that "[a]n insurer cannot 'make greater' something that did not exist previously," it ignored that Hartford's more favorable rate *did* exist at the time Mr. Reynolds applied for insurance, and, presumably, it would have offered him lower rates but for the contents of his consumer report. The unsupported premise of the district court's opinion is that the word "increase" refers only to an enlargement of a price previously offered to the specific consumer. But the district court was incorrect in supposing that reference to an "increased" price "plainly" refers only to a price that is different from what it was at another point in time. Both in common parlance and in legal discussion, one might well refer to one customer paying an "increased" price if he is offered a higher price than is offered to other consumers at the same time -- as was allegedly the case here. For example, in *Cornist v. B.J.T. Auto Sales, Inc.*, 272 F.3d 322 (6th Cir. 2001), a consumer claimed a violation of the Truth in Lending Act ("TILA") because she and other credit customers were quoted a higher base price for automobiles than cash customers, without any reference to such premium in TILA disclosures. In discussing the issues, the court of appeals consistently referred to the allegations of "increased" prices, even though there was

-12-

Exhibit D

no alleged *change* in prices over time. *See, e.g.*, 272 F.3d at 327 ("An increase in the base price of an automobile that is not charged to a cash customer, but is charged to a credit customer, *solely because he is a credit customer*, triggers TILA's disclosure requirements" (emphasis in original)). Similarly, if Mr. Reynolds was in fact quoted higher insurance rates than would have been the case if his consumer report had contained more favorable information (in other words, a higher price than Hartford offered consumers with better credit ratings), that higher price would be an "increase" over more favorable treatment. Such an increase should trigger an adverse action notice under the FCRA.

The district court's analysis artificially cabins the term "adverse action," and leads to a completely illogical result. In particular, § 1681a(k)(1)(B)(i) provides that "adverse action" encompasses "an increase in any charge for * * * any insurance * * * *applied for* * * *." (Emphasis added.) To avoid reading "applied for" out of the statute entirely, the court was forced to create a hypothetical sequence of events that defies common sense. Thus, it held that an insurance company increases the price of insurance "applied for" when it offers insurance "at one price and then raise[s] that price after it review[s]" the consumer report. *Mark v. Valley Ins. Co.*, 275 F. Supp. 2d at 1317. This is absurd since it assumes that an insurer would make a formal offer of insurance to a consumer and then, *after* making that offer, would

-13-

evaluate the consumer's insurability. But when interpreting a statutory provision, a court should "not assume that Congress intended a statute to create odd or absurd results." *Rucker v. Davis*, 237 F.3d 1113, 1119 (9th Cir. 2001). This Court should avoid the district court's assumption that Congress included a provision in the FCRA solely to address an absurd situation, and should instead give the words of § 1681a(k)(1)(B)(i) the far more natural meaning by interpreting them to encompass the situation where an insurance company charges a higher initial price based on information in a consumer report.

The text of § 1681a(k)(1)(B)(i) itself is, at worst, ambiguous regarding its application to initial offering of insurance rates. Such ambiguity may be resolved, however, by reading that provision contextually. The district court's restrictive interpretation of that subsection would render it jarringly inconsistent with § 1681a(k)(1)(B)(iv), which reflects Congress's overarching intent that all actions "adverse to the interests of the consumer," if based on information in a consumer report, trigger an "adverse action" notice.[8] By contrast, recognizing a broader reading

---

[8] Section § 1681a(k)(1)(B)(iv) states:

(k) Adverse Action.
    (1) Actions Included. The term "adverse action" -- * * *
        (B) means -- * * *
            (iv) an action taken or determination that is
                (I) made in connection with an application that was made

-14-

of the former subpart harmonizes the two, resulting in a coherent application of the principle that consumers should receive notice whenever information in a consumer report results in a detriment to them.[9] As this Court has recognized, proper statutory construction requires analyzing particular "provision[s] in the context of the governing statute as a whole, presuming congressional intent to create a 'symmetrical and coherent regulatory scheme.'" *Ramirez-Zavala v. Ashcroft*, 336 F.3d 872, 875 (9th Cir. 2003) (citation omitted; quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000)). The district court improperly ignored that maxim of statutory construction.

Even if the foregoing considerations do not themselves dictate adoption of plaintiffs' interpretation of the statute, they certainly show that the district court's restrictive approach is not the only plausible reading of the statute's text. Accordingly, the court should have gone beyond its truncated "plain meaning"

---

> by, or a transaction that was initiated by, any consumer
> * * * and
> (II) adverse to the interests of the consumer.

[9] Before the district court, plaintiffs argued that Hartford's conduct also constituted "adverse action" under § 1681a(k)(1)(B)(iv). The district court rejected this argument holding that, because § 1681a(k)(1)(B)(i) specifically applies to insurance, § 1681a(k)(1)(B)(iv) does not. 275 F. Supp. 2d at 1315. Although we do not rely on § 1681a(k)(1)(B)(iv) as an independent basis for a claim regarding insurance applications, it is nevertheless relevant to a proper reading of § 1681a(k)(1)(B)(i) for the reasons explained in the text.

Exhibit D

analysis, and considered the policies and legislative history behind that language. As explained below, that legislative history indicates that § 1681a(k)(1)(B)(i) should be interpreted to encompass actions unfavorable to the consumer taken in connection with the setting of the initial rates for the insurance.

### B.    The district court improperly ignored the FCRA's legislative history

The district court improperly ignored the legislative history of the FCRA's definition of "adverse action." This history demonstrates that Congress intended that the definition be given an expansive interpretation, not the narrow one imposed by the court.    Where, as here, a statutory provision is ambiguous (*i.e.*, § 1681a(k)(1)(B)(i)), "it is necessary to investigate the legislative history to discover the intent of Congress." *Exxon Mobil Corp. v. EPA*, 217 F.3d 1246, 1251 (9th Cir. 2000).  As described in detail below, this history shows that, when the FCRA was first enacted in 1970, its adverse action notice requirements applied to insurance companies when, based in whole or in part on information in a consumer report, they charge a higher initial price for insurance.  However, the requirements did not apply when consumer reports were used in connection with transactions that did *not* involve credit, insurance, or employment.  The bills and committee reports leading up to the 1996 amendments (which added the definition of adverse action) show that the purpose of the amendments was to expand the adverse action notice requirements, not

-16-

Exhibit D—

FROM STOLL STOLL BERNE   505 227 6840        (TUE) 1 27 04 11:56 ST 11:54/NO 4862062978 P  2

to contract them.  However, just as the court misunderstood the relevant provisions of the FCRA, it also misunderstood the Act's legislative history.

For the first 26 years of its existence, the FCRA applied to the conduct that is at issue in this case.  As originally enacted, the FCRA contained no definition of "adverse action" even though the term appeared in the Act.  In particular, the term was used in § 1681m(a), which set forth the obligations imposed on users of consumer reports.  That section provided:

> Whenever credit or insurance for personal, family, or household purposes, or employment involving a consumer is denied or the charge for such credit or insurance is increased either wholly or partly because of information contained in a consumer report from a consumer reporting agency, the user of the consumer report shall so advise the consumer against whom such adverse action has been taken and supply the name and address of the consumer reporting agency making the report.

This provision, like the current Act's definition of adverse action, refers to an "increase" in the charge for insurance.  The original version of § 1681m(a) was adopted, virtually verbatim, from the Senate version, S.823, 91st Cong. (1969).[9]  The committee report accompanying S.823 explained the breadth of the obligation

---

[9]   As originally proposed, the Senate's version required the consumer, upon learning of adverse action, to request the name of the consumer reporting agency.  When it adopted the FCRA, Congress made it mandatory for a user of a consumer report to notify the consumer of the name of the consumer reporting agency.  This was the only change that was made to the Senate version.  *See* H.R. Conf. Rep. 91-1587 (1970), *reprinted at* 1970 U.S.C.C.A.N. 4411, 4416.

-17-

Exhibit D

imposed by the section on users of consumer reports: "Those who reject a consumer for credit, insurance or employment *or who charge a higher rate for credit or insurance* wholly or partly because of a consumer report must * * * so advise the consumer and supply the name and address of the reporting agency." S. Rep. 91-517, at 7 (1969) (emphasis added). Thus, under the original version of the Act, an insurer "increases" the charge for insurance, and thereby takes adverse action, simply by charging a higher rate for insurance based on information in a consumer report. There is no indication that the "increases" that trigger an adverse action notice are limited to those situations where the insurer increases a rate that had been previously charged to the consumer.

Although the original Act's adverse action requirements applied when insurance companies use consumer reports to set initial prices, they did not apply in every situation in which a report user makes a decision unfavorable to the consumer. This was made clear by the Commission's Commentary on the Fair Credit Reporting Act. 55 Fed. Reg. 18804 (May 4, 1990, codified at 16 C.F.R. Part 600). This Commentary consolidated the Commission's interpretations with respect to each section of the FCRA and serves as guidance for consumer reporting agencies, users of consumer reports, and consumers. *See* 55 Fed. Reg. 18804. In the Commentary section discussing the obligations imposed by the Act on users of consumer reports,

-18-

Exhibit D

§ 1681m, the Commission stated that:

> The Act does not require that a [consumer] report user provide any notice to consumers when taking adverse action not relating to credit, insurance or employment. For example, a landlord who refuses to rent an apartment to a consumer based on credit or other information in a consumer report need not provide the [adverse action] notice. Similarly, a party that uses credit or other information in a consumer report as a basis for refusing to accept payment by check need not comply with this section. Checks have historically been treated as cash items, and thus such refusal does not involve a denial of credit, insurance or employment.

55 Fed. Reg. 18826. Thus, the Commission recognized that, as of 1990, there were entities who had a permissible purpose for receiving consumer reports under § 1681b (*e.g.*, landlords or merchants accepting checks) but who were not required by § 1681m to notify consumers when they made decisions based on those reports that were unfavorable to consumers.

The definition of "adverse action," which was added to the FCRA by the Consumer Credit Reporting Act of 1996, P.L. 104-208 ("CCRA"), was Congress's response to the Commission's 1990 Commentary. Although there were no committee reports issued in conjunction with enactment of the CCRA, reports were issued in connection with several earlier versions of the statute,[11] and these make clear that the definition was added to the FCRA to expand the coverage of § 1681m. The first

---

[11] Because the earlier versions were similar to the CCRA, it is appropriate for this Court to consider those reports. *See Exxon Mobil*, 217 F.3d at 1251-53.

-19-

relevant committee report was issued in connection with the Consumer Reporting

Reform Act of 1992.   H.R. 3596, 102d Cong (1992).   That bill proposed the

following:

> The term "adverse action" -- * * *
>
>> (2) includes --
>>
>>> (A) any denial of, increase in any charge for, or reduction in the amount of, insurance for personal, family, or household purposes made in connection with the underwriting of insurance* * *.
>>>
>>> (C) any action taken, or determination made --
>>>
>>> (i) with respect to a consumer for -- (I) an application for an extension of credit; (II) a report for the cashing of a check drawn by the consumer; * * * (IV) an application for the leasing of real estate; and
>>>
>>> (ii) which is adverse to the interest of the consumer.

H.R. 3596, § 102(a).  The report accompanying the bill explained that:

> [t]he definition makes clear that, in addition to denials of credit, insurance or employment, refusals to cash a check [or] lease real estate * * * based on a consumer report constitutes an adverse action.  This definition overturns a prior interpretation by the Federal Trade Commission ("FTC"), 55 Fed. Reg. 18826 (May 4, 1990), that refusals to cash a check or rent an apartment based on a consumer report do not trigger adverse action notices under the FCRA.

H.R. Rep. 102-692, at 21 (1992).  The committee report also stated that:

> [t]he definition section provides a list of transactions that are considered

to constitute examples of adverse action. This list is illustrative and not definitive. It is the Committee's intent that, whenever a consumer report is obtained for a permissible purpose under [§ 1681b(a)(3)] * * *, a denial of a benefit based on the report triggers the adverse action notice requirements under [§ 1681m].

*Id.*

The 103d Congress also considered adding a definition of adverse action to the FCRA. The House version, H.R. 1015, 103d Cong. (1994), included the following definition of adverse action:

The term "adverse action" -- * * *

    (2) includes --

        (A) any denial of, increase in any charge for, or reduction in the amount of, insurance for personal, family, or household purposes made in connection with the underwriting of insurance; [and] * * *

        (C) any action taken or determination made -- (i) in connection with an application which was made by, or a transaction which was initiated by, any consumer; and (ii) which is adverse to the interest of the consumer.

H.R. 1015, § 102. According to the House committee report, the definition "is intended to overturn a prior interpretation by the Federal Trade Commission" regarding the obligation of users of consumer reports who take adverse action. H.R. Rep. 103-486, at 26 (1994). The report also states that:

Although the definition section provides a list of transactions that are

Exhibit D

considered to constitute examples of adverse actions, this list is illustrative and not definitive.  It is the Committee's intent that, whenever a consumer report is obtained for a permissible purpose under [§ 1681a(a)], any action taken based on that report that is adverse to the interests of the consumer triggers the adverse action notice requirements of [§ 1681m].

*Id.*

The Senate version, S.783, 103d Cong. (1994), proposed adding the following definition to the FCRA:

(a) Adverse Action * * * The term "adverse action," * * * means an action that is adverse or less favorable to the interest of the consumer who is the subject of the report.  Without limiting the general applicability of the foregoing, the following constitute adverse actions: * * *

(3) Insurance -- A denial or cancellation of, or an increase in any charge for, or reduction or other adverse or unfavorable change in the terms of coverage or amount of, any insurance, existing or applied for, in connection with the underwriting of insurance.

S.783, § 101(1994).  Although this version contained introductory language that is not in the version ultimately adopted, its insurance provision is identical to § 1681a(k)(1)(B)(i).  The committee report does not specifically mention the Commission's Commentary, but does note that "the consumer protections in current law are not uniformly provided in all cases where an action that is not in the interest of a consumer is taken based on a consumer report." S. Rep. 103-209, at 4 (1993). According to the report, the proposal "seeks to ensure that the definition [of adverse

-22-

Exhibit D

action] parallels the permissible purposes for accessing the report and to provide adverse action protections any time the permissible use of a report results in an outcome adverse to the interests of the consumer." *Id.* The report further explains that, "[w]hile the Committee bill contains examples of adverse actions, the Committee intends the definition to be inclusive and to parallel the permissible purposes under which a consumer report may be obtained pursuant to [§ 1681b]." *Id.* at 8.

Finally, during the 104th Congress (the Congress that ultimately enacted the CCRA), the Senate considered S.650, which contained a definition of "adverse action" identical to the one ultimately adopted. The committee report explained that the definition was intended to overturn the Commentary. S. Rep. 104-185, at 31-32 (1995). It further explained that it intended for adverse action to:

> include[]a denial or cancellation of, an increase in any charge for, or a reduction or other adverse or unfavorable change in the terms of coverage or any amount of, any insurance, in connection with the underwriting of insurance. This portion of the definition applies to adverse determinations with respect to existing insurance or applications for new insurance.

*Id.* at 32. Again, there is no indication that S.650 was intended to narrow the coverage of the Act's adverse action requirements.

The district court made two errors in its analysis of the legislative history. *See Mark v. Valley Ins. Co.*, 275 F. Supp. 2d at 1317-18 (setting forth that analysis).

-23-

First, it ignored the fact that, under the FCRA as it was originally enacted, an insurance company's decision, based on information in a consumer report, to charge a higher price would clearly have constituted adverse action, triggering the notice requirement of § 1681m. *See id.* Thus, the court's analysis failed to take into account that, when it added a definition of "adverse action" to the FCRA, Congress was not writing on a clean slate. The original version of the Act states that an adverse action notice is triggered when "the charge for such * * * insurance is increased." That version mandated an adverse action notice whenever an insurer charged a higher rate based on information in a consumer report. S. Rep. 91-517, at 7. The current version states that adverse action means "an increase in any charge for * * * any insurance." There is no indication in any of the legislative history of the 1996 amendments of the FCRA that Congress intended to narrow the range of actions that would trigger the adverse action notice requirement. To the contrary, there is every indication that Congress intended the addition of a definition of "adverse action" to expand the range of actions triggering the notice requirement and to fill any gaps that the earlier version may have left. Thus, the current version, like the original one, applies to Hartford's actions.

The district court also erred by concluding that, because the definition of "adverse action" uses the verb "means," Congress intended the definition to be a

-24-

narrow one. *Id.* at 1318. According to the court, "[e]ach of the prior versions of the bill defined adverse action more broadly to 'include' specifically enumerated actions." Thus, the court held that the committee reports from 1992 through 1994 "do[] not clearly indicate that Congress meant something other than the plain meaning of the statutory language in § 1681a(k)(1)." *Id.*[12] In fact, although in the 103d Congress, the Senate's bill, S.783, used expansive language in the introductory portion of its definition, it did not use the verb "include" to introduce the subpart relating to actions taken by insurers. Nonetheless, the committee report that accompanied the bill made clear that the proposed amendment of the FCRA was intended as an enhancement to, not a narrowing of, preexisting protections. S. Rep. 103-209, at 5. In addition, the committee report accompanying S.650, which contained a definition of adverse action identical to the one that was adopted, explained that it applied to "'adverse action' with respect to * * * applications for new insurance." S. Rep. 104-185, at 32. Given the court's failure to conduct a careful examination of the statute's language, its claim to have found the "plain meaning" of the Act (a "plain meaning" that is in conflict with the clear intent of four

---

[12] The court's opinion in *Mark v. Valley Ins. Co.* does not mention S.650 or S. Rep. 104-185.

-25-

committee reports) is simply wrong.[13]

Hartford's actions that are at issue in this case would clearly have triggered the FCRA's adverse action notice requirement as it existed from 1970 until 1996. The legislative history of the 1996 amendments gives no indication whatsoever that Congress intended to narrow the coverage of the adverse action notice requirement. To the contrary, it shows that Congress's goal was to expand coverage. Thus, this Court should hold that the district court erred in its interpretation of the FCRA, and further hold that the Act requires Hartford to provide a consumer with an adverse action notice when, based on information in a consumer report, it charges the consumer a higher price.[14]

---

[13] The district court gave no weight to the Commission's March 1, 2000, informal staff opinion letter, which explained that, based on the Act's legislative history, the term "adverse action" should be interpreted broadly. In particular, the court stated that the letter was contrary to the "plain meaning" of the Act. 275 F. Supp. 2d at 1318. As explained above, the court misinterpreted the Act. The court also rejected the letter because it was a staff opinion, not the product of formal agency action. *Id.* However, the staff opinion letter is in complete accord with the Commission's Notice of User Responsibilities, 16 C.F.R. Part 601, App. C, which is the product of formal agency action (*i.e.*, notice and comment rulemaking, *see* 62 Fed. Reg. 35586 (July 1, 1997)), and which states the Commission's view that the term "adverse action" is defined "very broadly" by the FCRA. In any event, the present brief has, in accordance with standard Commission practice regarding *amicus* briefs, been approved by a vote of the Commission. The vote to approve the brief was unanimous.

[14] Section 311 of FACTA, which Congress passed in 2003, amends § 615 of the FCRA (15 U.S.C. § 1681m) to require that, when, based on information in a

## CONCLUSION

For the reasons set forth above, this Court should hold that, when an insurance company charges a consumer a higher price for insurance based in whole or in part on information in a consumer report, that insurer has taken "adverse action," as that term is defined in § 1681a(k) of the FCRA, and § 1681m requires that insurer to provide a consumer with an adverse action notice.

---

consumer report, a creditor grants credit on terms that "are materially less favorable than the most favorable terms available to a substantial proportion of consumers" from the creditor, that creditor must provide the consumer with a "risk-based pricing notice." This amendment of the FCRA was necessary because § 1681a(k)(1)(A) defines adverse action in the context of a credit transaction as having "the same meaning as in section 701(d)(6) of the Equal Credit Opportunity Act ["ECOA", 15 U.S.C. § 1691(d)(6)]." Section 701(d)(6) limits the definition of adverse action taken by a creditor to "a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested." This definition is further limited by the ECOA's implementing regulations to exclude counter-offers that the consumer accepts. 12 C.F.R. § 202.2(c)(1). Because, as explained above, the FCRA contains a much broader definition of adverse action in the context of insurance transactions, no similar amendment to expand that definition was necessary.

-27-

Exhibit D

Respectfully submitted,

WILLIAM E. KOVACIC
General Counsel

JOHN F. DALY
Deputy General Counsel for Litigation

LAWRENCE DeMILLE-WAGMAN
Attorney
Federal Trade Commission
600 Pennsylvania Ave., N.W.
Washington, D.C. 20580
(202) 326-2448

-28-

Exhibit D

## CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. P. 32(a)(7)(C), I certify that this brief is proportionally spaced and contains 6880 words. I relied on my word processor and its WordPerfect 10 software to obtain this count. I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

Lawrence DeMille-Wagman

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2004, I served two copies of a copy of the

Brief of the Federal Trade Commission as *Amicus Curiae* Supporting Appellants and

Urging Reversal on appellants and appellees by express overnight delivery directed

to:

Lisa Lear and Loren Podwill
Bullivant Houser & Bailey, PC
300 Pioneer Tower
888 SW 5th Avenue
Portland, Or 9204-2089

Charles Ringo
4805 SW 109th Avenue
Beaverton, Or 97005

N. Robert Stoll
Steve D. Larson
Scott A. Shorr
Stoll Stoll Berne Lokting & Shlachter PC
209 S.W. Oak Street, Fifth Floor
Portland, Oregon 97204


Lawrence DeMille-Wagman